No. 2881

Second Circuit

———

NUGENT v. McCURDY

———

(June 28, 1927. Opinion and Decree.)

———

(*Syllabus by the Court.*)

1. **Louisiana Digest—Office and Officer—Par. 52, 54.**

Agents of the State Conservation Commission employed to patrol the waters of the state and enforce the laws against illegal seining of fish are authorized under the law to seize but not to destroy seines of private individuals without an order of court.

2. **Louisiana Digest—Office and Officer—Par. 52, 54.**

The question, whether a seine is of legal or illegal mesh, is licensed or un-

licensed, is one of fact to be determined by courts and not by Conservation agents.

3. **Louisiana Digest—Office and Officers—Par. 49, 52, 54.**

Conservation agents can not usurp the functions of the courts and determine for themselves questions whether seines used in the waters of the state are of legal or illegal mesh, licensed or unlicensed.

4. **Louisiana Digest—Office and Officer—Par. 56, 57; Offenses and Quasi Offenses—Par. 6.**

Any person, whether he be a private citizen or an officer, who takes upon himself, without judicial sanction, the right to destroy private property and to abate an alleged nuisance, does so at his peril, and if it appear that he erred in judgment, he will be answerable in damages.

5. **Louisiana Digest—Office and Officer—Par. 49, 57.**

Act 137 of 1924, which confers upon Conservation agents the right to seize illegal seines used to catch fish in the waters of the state, contemplates a trial and adjudication before such seines may be destroyed, and agents who destroy them without such trial and adjudication are liable to the owners for their value.

Appeal from the Ninth Judicial District Court of Louisiana, Parish of Rapides. Hon. R. C. Culpepper, Judge.

Action by Ernest T. Nugent against William O. McCurdy, et als.

There was judgment for plaintiff and defendants appealed.

Judgment affirmed.

Hawthorn & Stafford, of Alexandria, attorneys for plaintiff, appellee.

Cleaveland Dear, of Alexandria, attorney for defendants, appellants.

ODOM, J.    Plaintiff owned a 600-foot seine which was destroyed by William O. McCurdy and A. B. Burns, agents of the Conservation Commission of Louisiana.

Plaintiff brought this suit to recover of the defendants the value of the property destroyed, plus damages resulting from the loss of the use of the seine.

Doctor V. K. Irion, Conservation Commissioner, was also joined as a party defendant. However, he has dropped out of the case, and the suit is not now being prosecuted against him.

McCurdy and Burns admit that they destroyed a seine on the banks of Little River in Grant parish, but allege that at the time the seine was destroyed they did not know who owned it. However, the proof makes it perfectly clear that the seine destroyed by them was the property of this plaintiff.

The main defense is that a seine such as was destroyed by defendants was of the kind which the law prohibits and declares to be a public nuisance; that it was unicensed, had been used in closed or prohibited waters; and that under the law they had a right not only to seize but to destroy it.

The lower court found for plaintiff, giving him damages for the value of the seine and rejecting his other demands.

The defendants have appealed.

## OPINION

The plaintiff was, at the time this controversy arose, and for a number of years prior thereto, engaged in commercial fishing and had always procured a license from the Department of Conservation for carrying on that business. He bought a new seine, 600 feet long, which, he swears, was of the kind which he and others in that locality had been using and which had been licensed and permitted by the Conservation Department of the state; which, he says, had a three-inch mesh. As to the kind of seine purchased, the mesh, etc., his testimony is corroborated by J. E. Ray, who ordered the seine for him.

On August 15, 1925, Nugent, the plaintiff, made the usual application to the Department for permission to use a seine. The application is on a printed form furnished by the Department, and was made out, that is, the blanks filled in, by Mr. T. C. Lincecum, who is connected with the Department, and was signed by Nugent, the plaintiff. The application as made out by Lincecum and signed by Nugent specified that the seine might be used in "Little River *above* Thompson's Ferry, Catahoula Lake, and all other permitted waters of the state".

When the application was signed by Nugent it was delivered to Lincecum who forwarded it to the New Orleans office in order that a permit might be issued. When the application was inspected at New Orleans it was discovered that the words, "above Thompson's Ferry", had been written in whereas it should have been written "*below* Thompson's Ferry", for the reason that under the rules of the Department the waters above Thompson's Ferry on Catahoula Lake were closed or forbidden waters; whereupon someone in the office at New Orleans drew a mark through the word "above" and wrote above it the word "below".

In the meantime Nugent, having observed that Lincecum, who represented the Department, had made out the application specifying that the seine might be used *above* Thompson's Ferry in Catahoula Lake, proceeded to use the seine in those waters, assuming, as he testified, that the Department had changed its rules, as it had a right to do, and intended to permit him to seine in those waters.

A similar permit had been granted to Mr. Gibson, another fisherman, who was at the same time seining *above* Thompson's Ferry.

It would therefore seem that Nugent was in good faith in using his seine *above* Thompson's Ferry, although he knew that theretofore the waters *above* the ferry were closed.

It may be well here to state that it was a custom, sanctioned by the Department, for those who made application for permits to seine to begin using the seine as soon as the application was made out and sent in before the final permit was issued; which accounts for the fact that Nugent began using the seine at once. Nugent later learned in some way that Lincecum had made an error which had been corrected in the New Orleans office. He testified, and his testimony on that point is not disputed, that as soon as he learned that his application had been changed and that there was some doubt as to whether he would be permitted to seine *above*

Thompson's Ferry, he took his seine out of those waters and dragged it up on the bank and left it there to await developments.

McCurdy and Burns, the defendants, while patroling the waters, discovered the seine lying out on the bank. There were evidences that the seine had been used above Thompson's Ferry and as there was no one in charge of it at the time they waited for someone to appear and claim it with a view of arresting and prosecuting the owner. They watched it for some two or three days. No one appearing to claim it and they not knowing to whom it belonged and therefore not able to make an arrest, seized and burned it where they found it.

As to their reasons for burning the seine, McCurdy says (page 14, evidence):

"Q. You burned it simply because you found it above Thompson's Ferry on Little River?

"A. Because I found it above Thompson's Ferry on Little River I burned it, and because of the fact that I had no means of transportation to bring it out; and for the further reason that there was no one in possession of it and I had no evidence as to whom it belonged, and there was no real reason why I should put myself to the trouble of bringing it out, as I had no case against anyone at the time for having that seine."

In that connection he was asked if he knew that Gibson, another fisherman, was seining at the same time above the ferry under a permit, and he said that he did:

Previous to giving the above testimony he was asked (page 13, evidence):

"Q. Mr. McCurdy, I believe you allege in your answer that that seine was an illegal seine; do you still persist in saying that?

"A. Under the strict construction of the law, it was. The law requires that the mesh of a seine be three (3) inches, and this was only 2¾ inches."

On page 48 of the evidence he was asked:

"Q. Then, as I understand it, you burned the seine up because you found it above Thompson's Ferry instead of below.

"A. I burned it because I found it being operated above Thompson's Ferry, and the physical evidence showed that it was being operated there. I had no evidence against any party, and I did not consider it worthwhile for me to go off and hire a truck to haul that seine out and put the state to that expense just in order to get an order from the court to destroy it, which would have been the final result in the end.

"Q. Now, suppose you had found this seine below Thompson's Ferry, would you have burned it?

"A. I would not."

From the foregoing testimony it is clear that the question whether the seine was of a legal or illegal mesh had nothing to do with defendants' conduct in destroying it; therefore that question is eliminated from consideration.

Both McCurdy and Burns say they acted in good faith in destroying the seine. It is very probable that they thought no one would ever appear to claim the seine; but the testimony as a whole does not impress us that they thought they had a right to destroy it as they did. They knew that Nugent's application, made out for him by an agent of the Department, had specified *above* Thompson's Ferry and that he had used the seine before he was informed it had been changed; they knew that others had seined in the same waters under like

conditions; they had never been instructed by Doctor Irion or anyone else to destroy property in this manner; they gave as their only reason for destroying the seine that it was too large to be transported in the Ford car which they were using and that they did not care to incur the expense of getting a truck to haul it; they said there was no necessity for doing so because the court would have ordered it destroyed, anyway.

On another occasion they found a seine in the same vicinity and did bring it out and held it for orders; but that was a 300-foot seine and was easily transported.

McCurdy says (page 44 of the evidence), that if he could have done so he would have brought the seine out.

These defendants knew that the law did not authorize them to destroy the seine, for in his testimony McCurdy mentions that he saw no use of bringing the seine in and having a court order to destroy it.

The conduct of McCurdy on another occasion indicates that he was disposed to use quite high-handed methods in the exercise of his authority, for he admits that on one occasion while patroling the waters he saw some persons on the river in a boat and that he beckoned them to come to the bank and that upon their refusal to do so he made several shots at them. However, he urged as an excuse that one of the parties reached his hand down in the boat.

Even if they had thought they were authorized in thus destroying seines while being used *above* Thompson's Ferry, they were aware that persons were led to believe that they might seine in those waters and were in good faith in doing so.

Defendants rely upon authority conferred upon them under Section 18 of Act No. 137 of 1924. That section of the statute reads as follows:

"That all unlicensed or illegal seines, hoop-nets, or other devices set or used in or upon any of the waters or the shores thereof, or islands of the state, are hereby declared to be public nuisances and may be seized by the Department of Conservation through any of its officers, inspectors or agents."

The authority of the agents and inspectors under this law is clearly limited to the right of seizure, and there is nowhere in the act any right or authority conferred for destroying illegal seines. We have examined similar acts preceding the Act of 1924 and find that in none of them are Conservation agents authorized to do more than seize illegal nets or nets which are being used in prohibited waters.

Defendants say that the results would have been the same if the net or seine had been carried out; that the court would have ordered it destroyed, anyway.

That may or may not be true. There is a serious question in this case whether this was an illegal seine. Plaintiff swears that it was not—defendants say that under strict construction of the law it was. But that was a question for the court to decide—not these defendants. No one has a right to usurp the functions of courts in such matters. Defendants had no right to take upon themselves the functions of judge and executioner. Besides that, they did not destroy the seine because it was illegal but because it was being used

in what they deemed prohibited waters. On that point we think it very doubtful whether the court would have sustained a criminal charge against plaintiff for seining in prohibited waters, in view of the fact that his application to use the seine, made out by an agent of the Department, specifically stated that it was to be used above Thompson's Ferry.

Counsel for defendants argues that inasmuch as the act declares illegal seines to be a public nuisance they may be destroyed by officers; but the law which he cites does not authorize officers to destroy them—it provides that they may be seized—not destroyed. If the legislature had intended to grant authority for summary destruction of such property by Conservation agents it could easily have expressed that authority.

Section 37 of Act No. 137 of 1924 provides that all barrels, boxes, etc., of fish not labeled and shipped in a certain way "may be confiscated", but with reference to seines the only authority given is to seize them.

In the case at bar there was a serious controversy as to whether this was an illegal seine and as to whether plaintiff had a right to use it above Thompson's Ferry. Those were questions which could legally be determined only by the court. Plaintiff was to say the least entitled to "a day in court". The law hears before it condemns, and the proper tribunal to hear and condemn is the court.

The state of Michigan has a statute which authorizes the seizure of nets in unlawful use as does ours. The Supreme Court of that state in two cases, Neal vs. Morris, 96 N. W. 14, and Osborn vs. Circuit Judge, 72 N. W. 982, specifically held that the law contemplated a trial and adjudication before such nets were destroyed, and upheld a judgment against the game and fish warden for the value of nets destroyed by him without an order of court.

It is fundamental that officers such as these are liable for acts done in excess of their jurisdiction. The only exception is found in cases where the act done is purely ministerial and done in executing orders of superiors.

29 Cyc. 1441.

See "Fish and Game," 19 Cyc. 1925, and authorities there cited under note 25.

In Beers vs. Board of Health, 35 Ann. 1132, the president of the Board of Health was held liable for acts "unauthorized, arbitrary and wrongful".

See 24 A. L. R. 802.

"The authorities are generally agreed that whoever abates an alleged nuisance, and thus destroys or injures private property, or interferes with private rights, whether he be a public officer or private person, unless he acts under the judgment or order of a court having jurisdiction, does it at his peril; and that when his act is challenged in the regular judicial tribunals it must appear that the thing abated was in fact a nuisance. If it appears that he erred in judgment, he will be answerable in damages, and if a breach of the peace is involved he may be liable criminally for the result."

20 R. C. L. 491.

See Tissot vs. Great Sou. Tel. & Tel. Co., 39 La. Ann. 996, 3 South. 261.

Even if the seine in question was illegal and if for that reason a public nuisance, and if defendants had a right to abate the nuisance without an order of court, the nuisance should have been abated by seizure of the seine, which is what the law says may be done.

The conduct of the defendants was without warrant in law, arbitrary, unreasonable and unjustifiable, and we think not in good faith.

The lower court held defendants liable for the value of the property destroyed and rejected plaintiff's demands otherwise.

The judgment is affirmed.